# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT KNOXVILLE
## Assigned on Briefs April 23, 2024

## STATE OF TENNESSEE v. JASON LEE KINSER

### Appeal from the Criminal Court for Knox County
No. 118678     Steven Wayne Sword, Judge

_____

### No. E2023-00987-CCA-R3-CD

_____

In March 2021, the Knox County Grand Jury issued an indictment, charging Defendant, Jason Lee Kinser, with rape and aggravated burglary. Following a trial, a jury found Defendant guilty as charged, and the trial court imposed an effective sentence of thirty years' incarceration. On appeal, Defendant contends that he is entitled to plain error relief based upon testimony during trial that Defendant's name was in a criminal justice database. Defendant also contends that he was under the influence of drugs during trial and was incompetent to waive his right to testify. Following a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Nicholas W. Lee, Knoxville, Tennessee, for the appellant, Jason Lee Kinser.

Jonathan Skrmetti, Attorney General and Reporter; Katherine Orr, Assistant Attorney General; Charme P. Allen, District Attorney General; and Rachel Hill and Sean Roberts, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

Prior to trial, Defendant filed a "Motion-in- Limine Regarding Other Charges[,]" in which Defendant requested that the trial court prevent "testimony regarding any criminal charges other than the ones charged in this matter, specifically but not limited to any

charges potentially related to what may be related to sexual offenses[.]" In his motion, Defendant cited to Tennessee Rules of Evidence 404, 609, 402, 403, and 412. The case proceeded to trial in December 2022. Although the parties discussed Defendant's motion in limine at the start of trial, the court reserved judgment on the issue and directed the parties to ask for a jury-out hearing should the State wish to introduce such evidence.

The victim testified that, in September 2020, she lived on East Caldwell Avenue in Knoxville. The victim stated that, on September 5, 2020, she allowed her aunt, Sherry Hatfield, to come over to her house to do laundry. The victim explained that she lived with her two sons but that her sons were staying at their father's residence at the time, so she was alone. The victim said that, when Ms. Hatfield arrived, Defendant and a female friend of Ms. Hatfield's accompanied Ms. Hatfield. The victim testified that she had never met Defendant before but said that she, Defendant, Ms. Hatfield, and Ms. Hatfield's friend sat on her front porch for two or three hours, talking and drinking alcohol. Ms. Hatfield and her friend then left the victim's house with Defendant. The victim saw all three individuals leave; she then went inside her house and shut the front door. She recalled that she did not lock the front door.

When asked about her plans for the rest of the day, the victim stated:

> I have night medicine I take. And I -- anxiety and stuff, so decided I would go ahead and lay down. I mean, I didn't have my boys that day, so I really wanted to rest and have a good night's sleep. So that was my plan for the rest of the evening.

The victim said that she had been prescribed both Trazodone and Seroquel. When asked how the medications would make her feel, the victim responded, "Sleepy, your body really heavy, you know, just I guess time to check out[.]" She said that she took either Trazodone or Seroquel or possibly both medications that evening after everyone left the house. She then went into her bedroom, laid down, and fell asleep on her bed. The victim testified that there had been no plan for Ms. Hatfield, Ms. Hatfield's friend, or Defendant to return to her house.

The victim said that, during the night, she woke up feeling like she could not breathe. She testified, "I was laying on my stomach and I was being pushed down. My chest was really heavy. And I felt anal penetration, which was really painful. And at first, I really couldn't move." The victim stated that she was being penetrated anally by a penis. She said that she was "shocked" and "didn't know what was going on." She continued, "At first, I was like, is this a dream? And, you know, I -- I panicked. I tried to jump up and, once again, I felt pressure on my -- like somebody was holding me down and I couldn't move."

The victim testified that she eventually got the man off of her and that she began hitting and screaming at him. She said that she could not tell whether the man ejaculated during the assault. She said that she was then able to see the man and that she recognized Defendant as the man Ms. Hatfield brought to her house earlier that day. She testified that she saw "his whole body, his stomach, [and] his face." The victim testified that Defendant had a scar on his stomach, and she identified a photograph of Defendant's stomach with the scar. She said that she yelled at Defendant and tried to push him out of her house. When asked how long Defendant had been in her house, the victim stated:

> How long was he there for before he left? From the time that . . . I'm not sure how long he was there prior to me waking up. But when I woke up, maybe, about 10 minutes, 15 minutes. [Ms. Hatfield] was outside at that time . . . I was chasing [Defendant] out of the house. She was helping me, obviously, you know, wailing on him, asking him, what did you do to my niece? What did you do to my niece? And then he just . . . got in a vehicle and took off.

The victim testified that she told Ms. Hatfield what Defendant had done. She testified that Defendant did not have permission to be inside her house and that he did not have her permission to penetrate her anally while she was sleeping. The victim said that she did not immediately call the police; she tried to deal with the assault by drinking a lot of alcohol, but she eventually began to have thoughts of committing suicide. The victim explained that she told her mother and siblings about these thoughts, and her mother called the police on her behalf three or four days after the assault occurred. The victim recalled that police arrived and that she reported the rape and allowed a search of her home. She said that, with encouragement from the police, she went to the hospital where she met with a nurse who performed a physical examination. When asked why she submitted to the examination, the victim replied, "I felt like I had to. I mean, I wanted to make sure I didn't have any STDs or anything like that that -- also, I knew that . . . what happened to me was wrong and it wasn't my fault."

The victim testified that she provided the police with a description of Defendant, including information about the scar on his stomach. She also told the police that she believed Ms. Hatfield's friend, whom the victim knew as "Sarah," was Defendant's girlfriend and that Sarah lived at a nearby halfway house. The victim testified that, between the time of the assault and the time she reported it to the police, she had showered several times and that she had cleaned her "private parts" thoroughly. She agreed that she had also had a bowel movement between the time of the assault and when she was examined at the hospital.

- 3 -

The victim stated that, a week or so later, she went to the police department to view a photographic lineup. She recalled that she thought two men in the lineup looked similar and that she initially picked out a man that looked like Defendant but was not him. She said that Defendant's photograph was the second one she picked from the lineup. The victim identified Defendant in the courtroom and stated that she had no doubt that Defendant was the man who entered her house that night and raped her.

On cross-examination, the victim testified that Ms. Hatfield, Defendant, and Ms. Hatfield's friend came over to her house between 2:00 and 3:00 p.m. She said that they were there drinking with her for two or three hours and left between 4:00 and 5:00 p.m. The victim stated that Defendant drove the car to her house. She recalled that she fought with Defendant for a couple of minutes before he left her house. The victim said that she normally slept with the television on in her bedroom so that the room had "pretty good lighting." She agreed that, although she eventually identified Defendant as the man who raped her, she initially identified a different man in the photographic lineup.

Sherry Hatfield testified that the victim was her niece and that, on September 5, 2020, she was at the victim's house. Ms. Hatfield said that she invited Defendant, whom she had only known a "short time[,]" over to the victim's house. Ms. Hatfield recalled that she had been drinking and watching movies at the victim's house and that she may have been doing laundry as well. Ms. Hatfield said that she was at the victim's house for about an hour before she left with Defendant, who dropped Ms. Hatfield off at Ms. Hatfield's residence. Ms. Hatfield testified that, while at the victim's house with Defendant, she never saw the victim make any sexual advances toward Defendant, invite him to stay at her house, or ask him to come back and spend more time with her.

Ms. Hatfield testified that she next saw Defendant at the victim's house "maybe an hour" later. She explained that the victim called her and told her "what [Defendant] had done to her." She said that the victim was upset and crying on the phone. Ms. Hatfield said that she "walked back down there and asked [Defendant] what he did to [the victim] and . . . even pulled a knife on him."

On cross-examination, Ms. Hatfield stated that the only other people at the victim's house that day were the victim and Defendant. She said that she arrived at the house around 5:00 p.m. She stated that she did not see the victim or Defendant drinking and that she left the victim's house between 6:00 and 7:00 p.m. Ms. Hatfield estimated that the victim called her about forty-five minutes after Ms. Hatfield returned home. She said that she did not notice any marks on the victim that night.

Jenna Peterson testified that she was a sexual assault nurse examiner and that she met with the victim on September 9, 2020, at 4:15 a.m. Ms. Peterson explained that the

victim consented to an examination and to the collection of evidence as part of a sexual assault kit. Ms. Peterson stated that because of what the victim reported, she conducted only an external examination of the victim's vagina. She then examined the victim's anus where she did not observe any injuries to the area. Ms. Peterson testified that she collected a buccal swab from the inside of the victim's cheek, a perineal swab, and "an anal swab, which is more specifically the perianal folds, externally." She testified:

> In my practice, it's a double swab technique, so it's two swabs that are rolled over the perianal folds, anal area. And there's maybe pieces of the swab that -- it's cotton that it's probably not bigger than . . . your pinkie nailbed, generally insert that slightly into the anus.

Ms. Peterson stated that the passage of time impacts the ability to collect DNA evidence following a sexual assault. She explained that "the longer the time passes, especially in the anal canal, I mean, it dramatically drops, your rate of being able to collect DNA." She further stated that victims of sexual assault are typically told not to shower after the assault because showering also affects the ability to obtain a suspect's DNA. She agreed that a bowel movement could impact the likelihood of finding any suspect DNA in the anal canal of a victim. When Ms. Peterson was asked whether the level of a person's relaxation would impact whether or not she would expect to see signs of injury following anal penetration, Ms. Peterson responded, "Definitely. If you're relaxed, you know, and there's lubrication involved, especially, then you're not likely to see any injury." She agreed that a person would be relaxed during sleep.

On cross-examination, Ms. Peterson agreed that it was noted by the emergency room at the hospital that the victim had alcohol in her system. Ms. Peterson said that the victim reported she "immediately screamed and the person got off of her[.]" The victim told Nurse Peterson that she did not know who the assailant was but that she believed the sheriff's office knew him. Ms. Peterson testified that she did not see any injuries to the victim.

Special Agent Marla Gray testified that she worked in the forensic biology unit of the Tennessee Bureau of Investigation Crime Laboratory in Knoxville. Agent Gray said that, in connection with Defendant's case, she received a request for DNA analysis on the following items of evidence: buccal swabs from the victim, external vaginal swabs, perianal and perineal swabs, a white sheet, and a blue fitted sheet. Agent Gray testified that her testing of the swabs from the victim's sexual assault kit did not indicate the presence of male DNA.

On cross-examination, Agent Gray said that testing of the white sheet and blue sheet did not indicate the presence of semen. She testified that she would not expect to find

semen on such evidence when no ejaculation occurred. She agreed that there was nothing in her report "that tie[d] [Defendant] to the crime that's alleged here[.]"

Detective Tim Riddle with the Knoxville Police Department testified that, on September 8, 2020, he became involved in a rape investigation after patrol officers responded to a call of an alleged "suicidal rape victim" at a house on East Caldwell. Detective Riddle stated that, when he arrived at the scene, he spoke to the victim and took a brief statement from her about what had happened to her. Detective Riddle recalled that the victim appeared to have been drinking, but he said that she was not drunk. He said that the victim was coherent and seemed depressed. Detective Riddle explained that the victim described her assailant as a "white male named Jason." She told him that the man had a scar on his stomach. The victim explained that a woman named Sarah Sneed was the suspect's girlfriend. Detective Riddle said that he "gained details that Sarah Sneed was a possible associate of Jason['s] . . . and she was in a halfway house on Morelia, which [was] probably about five blocks away from where [the victim] live[d]." He explained that patrol officers went to the halfway house, located Ms. Sneed, and detained her. Detective Riddle testified that he interviewed Ms. Sneed, who provided Defendant's name and identified Defendant as her ex-boyfriend.

Detective Riddle said that officers attempted to locate Defendant but were unsuccessful. Detective Riddle testified that, in his experience investigating rape cases, it was common for victims to delay reporting the offense. He said, "Fear and shame is why they do not come out initially."

Detective Riddle testified that the victim came to the police department on September 28, 2020, for a follow-up interview. At that time, Detective Riddle showed her a photographic lineup that included Defendant. Regarding the victim's identification of Defendant's photograph, Detective Riddle said that she "was unsure between two photos." He said that she initially selected the man in photograph number 1. Detective Riddle took the photographic lineup from her, and she said, "[W]ell, it's number 5." Detective Riddle explained that the victim "engaged [him] again[,]" so he asked her to clarify. She said that she "felt confident" that the man in photograph number 5 was her assailant and circled his photograph. Detective Riddle testified that Defendant was the man in photograph number 5.

During Detective Riddle's testimony on direct examination, the following exchange occurred:

> Q. Okay. As part of your investigation, . . . did you look into any databases that you had access to?

A. Once we were able to get his name, there's several databases we can look into to learn more information about him.

Q. And once you looked into databases, . . . was one of those databases what's called a criminal justice database?

A. Yes.

Q. And does that database contain publicly available records for various individuals?

A. A lot of times, it will give a lot of history about the young man or young woman. It keeps up with a lot of photos, at times, maybe scars, marks and tattoos and things of that nature.

Q. And for some individuals, does that database include photographs?

A. Yeah. It does include photos. And it also has a number generated for that particular individual.

Q. Okay. As part of your research into that database, did you find any images of your suspect, [Defendant]?

A. Yes.

Q. Were any of them important or relevant to your investigation?

A. To me . . . it was -- there was the huge scar on his stomach, just because that's what I initially was told. You know, [the victim] says, first time she ever met him and the first thing she knew about him was he had a significant scar on his stomach.

Q. Okay. So in this database, did -- just to be clear, did you find a photograph of [Defendant's] abdomen?

A. Yes.[1]

---

[1] The State introduced as an exhibit to Detective Riddle's testimony the photograph of Defendant's abdomen.

Detective Riddle said that, during his investigation, he was unable to locate Defendant despite multiple attempts. He said that he took out a warrant for Defendant's arrest on October 12, 2020, and that he did not get the opportunity to interview Defendant regarding the victim's allegations.

At a jury-out hearing, the trial court considered whether the State could use Defendant's prior criminal convictions to impeach him under Rule 609 of the Tennessee Rules of Evidence. After reviewing the lengthy list of offenses, the trial court determined that all of Defendant's prior convictions would be excluded, except for two felony drug convictions, a perjury conviction, and a conviction for violating the habitual motor vehicle offender law.[2]

During a *Momon* hearing, Defendant acknowledged that he understood he had the right to choose whether or not to testify and that the choice was Defendant's alone. The trial court told Defendant:

> THE COURT: Okay. And so you also know you have a right not to testify, nobody can force you to, right --
>
> . . . .
>
> THE COURT: -- it's got to be your decision? So I want you to listen to your lawyer and consider his advice, but, ultimately, it's your choice. He can tell you, I think you need to testify, and if you don't want to, guess what, you're not going to testify. It's your choice. If he says, I don't think you should testify, and you say, I really want to get up there and testify, it's your choice and you get to testify, right? It's your decision. He's a smart guy and you should listen to his advice and consider it, but you don't have to follow it, right? That's your decision.

After giving Defendant additional time to discuss the matter with defense counsel, the following exchange occurred:

> THE COURT: All right, [Defendant]. It's time to decide. What do you want to do? Do you want to testify or no?
>
> [Defendant]: No, sir.

---

[2] Defendant's convictions excluded by the trial court included a conviction for aggravated sexual battery and multiple convictions for violating the sex offender registry and community supervision for life.

THE COURT: All right. And you do know if you wanted to, you could, right?

[Defendant]: Yes, I do.

Following deliberations, the jury found Defendant guilty of rape and aggravated burglary, as charged. At a sentencing hearing, the trial court found that Defendant was a Range II multiple offender for the purposes of his rape conviction and sentenced Defendant to eighteen years with a one hundred percent release eligibility for that offense. As to Defendant's conviction for aggravated burglary, the trial court found that Defendant was a Range III persistent offender and imposed a consecutive sentence of twelve years with a forty-five percent release eligibility, for a total effective sentence of thirty years in the Tennessee Department of Correction.

Defendant filed a timely motion for new trial and amended motion for new trial. In his motion for new trial and amended motion for new trial, Defendant asserted that the trial court committed plain error in admitting Investigator Riddle's testimony that he located Defendant's information in a criminal database in violation of Tennessee Rules of Evidence 402, 403, and 404. Defendant also asserted that the trial court committed plain error by allowing the trial to proceed while Defendant was "under the influence of an illicit substance, to wit . . . methamphetamine." Defendant alleged that he was under the influence of methamphetamine during trial and that he tested positive for the drug when he was "processed into custody after the conclusion of the trial." Defendant maintained that the error deprived him of his right to due process and right to a fair trial and that it impacted his ability to "make an informed decision on the issue of whether to testify[.]"

At the hearing on the motion for new trial, the parties stipulated that Defendant took a drug test on December 9, 2022, two days after his trial, and that "meth and/or meth remnants were in [Defendant's] system at the time of that testing." Additionally, a copy of the results of the drug test was admitted as an exhibit.

Kinsey Slater testified that she had been in "an off-and-on relationship" with Defendant for five or six years. Ms. Slater stated that she was present at Defendant's December 7, 2022 trial. She said that she had been around Defendant when he had been sober and when he had been under the influence of drugs. She said that Defendant's behavior and manner during the trial was consistent with Defendant's being under the influence. Ms. Slater testified that she did not tell defense counsel of her belief that Defendant was under the influence of drugs until after trial. She explained that she "didn't want to hurt [Defendant] in any way."

- 9 -

On cross-examination, Ms. Slater testified that she had previously seen Defendant use methamphetamine and "[p]ossibly heroin." She said that she did not see Defendant take methamphetamine on the day of the trial. When asked "[w]hat about [Defendant's] demeanor on the day of trial made [her] concerned that he was under the influence[,]" Ms. Slater testified that Defendant was "very fidgety" and "a little clammy looking."

Erica Kinser, Defendant's daughter, testified that she had been around Defendant when he had been taking drugs and when he had been sober. She agreed that there was a "marked difference" between Defendant's behavior while under the influence of drugs. Ms. Kinser said that she was present during Defendant's trial and that she believed Defendant was under the influence at that time. When asked what about Defendant's behavior made her concerned that he was under the influence of drugs, Ms. Kinser stated:

> Well, on the way down here, [Defendant's] nodding out. And then when we got here, [Defendant] told us to get out of the car, meaning, you know, he was going to do something. And then when we got up here, he was sweating, his eyes -- his whole demeanor, I could just tell.

On cross-examination, Ms. Kinser said that she did not see Defendant take drugs the day of his trial.

Cathy Jones, Defendant's mother, testified that she had also been around Defendant when he was sober and when he was under the influence of drugs. Ms. Jones agreed that Defendant's behavior was markedly different when he was using drugs. Ms. Jones testified that she attended Defendant's trial; she explained that she rode to court with Defendant and Ms. Kinser on the morning of trial. Ms. Jones stated that Defendant's "manners throughout the day" were consistent with his being under the influence. She said that Defendant was "nodding out" and sweating excessively and that he was "just clammy looking."

Defendant testified that, on the day of his trial, he took methamphetamine. He said that he had not slept in two weeks. He testified that he had Ms. Jones and Ms. Kinser exit the car once they arrived at the courthouse and that he ingested methamphetamine "right before [he] came in just so [he] could stay awake." He said that he took methamphetamine twice on the day of his trial. He did not tell defense counsel about his drug use until after trial. When asked how his drug use affected him during trial, Defendant said, "[A] lot of times, I didn't even really know what was going on. I'm just going through the motions . . . ." Defendant testified that he did not understand the questions asked of him during his *Momon* hearing. He stated that he did not have a clear mind when the hearing occurred. Defendant explained, "Because, like, part of me wanted to testify, part of me didn't. I was so scared and nervous, I didn't know what to answer, how to answer. I was just like -- I

was all discombobulated." When he was asked if at any point during the trial he was able to think clearly, Defendant responded, "Not from -- even from the onset."

Defendant testified that he took a drug test on December 9, 2022, after he was taken into custody. He said that he ingested methamphetamine twice the day of trial; he said that he took methamphetamine when he stopped at a restroom on the way to the courthouse and that he took more after Ms. Jones and Ms. Kinser exited the car. Defendant claimed that he had also taken heroin around 6:00 a.m. that morning.

On cross-examination, Defendant acknowledged that taking methamphetamine helped him stay awake and "more alert to what's going on[.]" He agreed that, during trial, he did not fall asleep, he was able to take notes, and he discussed things with defense counsel. He agreed that he spoke to Ms. Slater from the jail on December 8, 2022. He acknowledged he had told Ms. Slater that the trial court had ruled that the State could not ask him about certain prior convictions if he testified. He agreed that he had expressed during his call with Ms. Slater that he had understood that he had an opportunity to testify.

The trial court took the matter under advisement and then issued a written order denying Defendant's motion for new trial. This timely appeal follows.

## Analysis

### A. Reference to a "criminal justice database"

Defendant asserts that the trial court committed reversible error when it permitted testimony that Detective Riddle's investigation was narrowed down, at least in part, due to Defendant's inclusion in a criminal justice database. Defendant argues that the phrase "criminal justice database" was not relevant and created a danger that the jury would assume Defendant had a prior criminal history.

The State responds that Defendant waived his claim by failing to raise a contemporaneous objection and that Defendant is not entitled to plain error relief. We agree with the State.

First, as noted by the State, Defendant waived this issue by failing to raise a contemporaneous objection to Detective Riddle's testimony about his locating Defendant's information in a criminal justice database. *See* Tenn. R. App. P. 36(a); *State v. Vance*, 596 S.W.3d 229, 253 (Tenn. 2020); *State v. Jordan*, 325 S.W.3d 1, 58 (Tenn. 2010). In his brief, Defendant argues that his failure to raise a contemporaneous objection did not waive the issue because he filed a pretrial motion in limine to "prevent testimony regarding any criminal charges other than the ones charged in this matter." Defendant asserts that "an

- 11 -

objection will be seen to be raised if a motion in limine was filed on the issue[,]" citing *State v. Halake*, 102 S.W.3d 661, 669 (Tenn. Crim. App. 2001). *See also State v. Emesibe*, No. M2003-02983-CCA-R3-CD, 2005 WL 711898, at *6 (Tenn. Crim. App. Mar. 28, 2005) (stating that, in order to challenge on appeal the introduction of evidence at trial, counsel must make a contemporaneous objection to the admission of the evidence, "either in a motion in limine or at the time the evidence is introduced at trial"), *perm. app. denied* (Tenn. Oct. 17, 2005). "A motion in limine alone, however, does not preserve the issue for appeal if the trial court defers ruling upon the motion until a jury-out hearing prior to the introduction of the challenged evidence, even when the issue is included in the defendant's motion for new trial." *Id*. (citing *State v. McGhee*, 746 S.W.2d 460, 464 (Tenn. 1988)).

In this case, Defendant filed his "Motion-in-Limine Regarding Other Charges" before trial, but the court deferred ruling on the motion until a jury-out hearing prior to the introduction of the challenged evidence. Accordingly, to preserve the issue for plenary review, Defendant should have raised a contemporaneous objection during Detective Riddle's testimony at the mention of the criminal justice database. By failing to do so, Defendant limited this court's review of the issue to plain error review. *See McGhee*, 746 S.W.2d at 464; *Emesibe*, 2005 WL 711898, at *6.

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id*. at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. In addition, the "'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642. Defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

Here, the victim identified Defendant as the man who entered her house while she was sleeping and raped her. The victim testified that she recognized Defendant because he accompanied Ms. Hatfield when Ms. Hatfield visited the victim's house earlier that day, and the victim was able to tell police about a distinctive scar on Defendant's abdomen. During Detective Riddle's testimony, the State was attempting to explain how the image of Defendant with a scar on his abdomen came into the possession of Detective Riddle. The State asked the detective if one of the databases he used to get the image was "a

criminal justice database[,]" and Detective Riddle answered in the affirmative. The reference was brief, and the State presented no evidence that Defendant committed any criminal offenses in the past. Under these circumstances, we conclude that any error was not of such a great magnitude that it probably changed the outcome of the trial. *Adkisson*, 899 S.W.2d 642. Therefore, consideration of the error is not "necessary to do substantial justice," and Defendant is not entitled to plain error relief. *Id*. at 641.

## B. Defendant's waiver of his right to testify

Defendant contends that the trial court erred in denying his motion for new trial after hearing evidence that Defendant was "under the influence of an illicit substance" during trial. Defendant asserts that his substance use immediately prior to trial prevented him from voluntarily, knowingly, and intelligently waiving his "right to testify or remain silent."

The State responds that Defendant failed to prove that he was unable to waive his right to testify. We agree with the State.

In *Momon v. State*, 18 S.W.3d 152, 161 (Tenn. 1999), the Tennessee Supreme Court held that a defendant's right to testify is a fundamental constitutional right that must be personally waived by the defendant. To ensure personal waiver by the defendant, "defense counsel shall request a hearing, out of the presence of the jury, to inquire of the defendant whether the defendant has made a knowing, voluntary, and intelligent waiver of the right to testify." *Id*. at 162. No particular litany is required, but defense counsel must at a minimum show "that the defendant knows and understands that":

> (1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;

> (2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;

> (3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify.

*Id*. at 162. These procedures are "prophylactic measures which are not themselves constitutionally required." *Id*. at 163. A competent defendant is one who has "the capacity

- 13 -

to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense." *Mackey v. State*, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975) (citations omitted). The defendant bears the burden of establishing his incompetence by a preponderance of the evidence. *State v. Reid*, 164 S.W.3d 286, 306 (Tenn. 2005).

In this case, the trial court conducted a *Momon* colloquy with Defendant after the close of the State's proof. Defendant confirmed under oath that he understood that he had the right to testify. The court then allowed Defendant additional time to consult with defense counsel, and after consulting with counsel, Defendant informed the court that he did not wish to testify.

In addressing this issue in its order denying the motion for a new trial, the trial court found that Defendant had failed to establish that he had not been mentally competent to proceed to trial or that he had been under the influence of drugs. The court noted that Defendant did not appear to the court to be under the influence of a controlled substance and that defense counsel indicated he did not notice that Defendant was under the influence during trial. The trial court found that Defendant "was able to respond to the court throughout the trial to all questions asked of him[,]" that defense counsel consulted with Defendant during trial, and that defense counsel never expressed any concern about Defendant's mental capacity. Moreover, in his jury-out colloquy, Defendant affirmed that defense counsel had discussed with him his decision with respect to testifying and that he understood that the decision was his alone and that he could testify regardless of defense counsel's advice.

As noted by the State, the only proof establishing that Defendant was under the influence of drugs during trial was Defendant's self-serving testimony that he used heroin and methamphetamine that morning. None of Defendant's witnesses testified that they saw Defendant consume drugs on the day of trial. Moreover, although a drug test taken two days later showed that Defendant tested positive for remnants of methamphetamine, Defendant admitted that, in the three weeks prior to trial, he was using methamphetamine every day. Under these circumstances, we conclude that Defendant has failed to establish by a preponderance of the evidence that he was incompetent to voluntarily, knowingly, and intelligently waive his right to testify. *Id.* He is not entitled to relief on this claim.

## Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 14 -